CULLEN & DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, NY11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.

Proposed Counsel for The College of New Rochelle

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                   :

In re:                          :   Chapter 11
                                   :

THE COLLEGE OF NEW ROCHELLE,  :   Case No.
                                   :
                                   :

             Debtor.          :
                                   :

------------------------------------------------------------x

### AFFIDAVIT OF MARK D. PODGAINY
### PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF NEW YORK    )
                           )ss:
COUNTY OF NEW YORK  )

**MARK D. PODGAINY**, being duly sworn, deposes and says:

1.      I am a managing director of Getzler Henrich & Associates, LLC.  On September 3, 2019, I stepped into the role of Interim Chief Restructuring Officer of The College of New Rochelle (the "**Debtor**") due to the medical leave of the Chief Restructuring Officer, Herbert A. Weil.  In this capacity, I am familiar with the day-to-day operations and financial affairs of the Debtor.

2.      I submit this affidavit pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") in support of the Debtor's petition for

relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"). Except as otherwise indicated, all facts set forth in this affidavit are based upon personal knowledge, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of the Debtor.

## I.  INFORMATION REQUIRED BY LOCAL RULE 1007-2

3.    Local Rule 1007-2 requires certain information related to the Debtor, which is set forth below and in the schedules annexed hereto. Unless otherwise indicated, the financial information contained herein is unaudited.

4.    Local Rule 1007-2(a)(1): The nature of the Debtor's business and the circumstances leading to the Debtor's filing of its Chapter 11 case are as follows:

The College of New Rochelle ("**CNR**" or the "**Debtor**") was established by grant of the action of the New York State Board of Regents in 1898 under the corporate name "Ursuline Seminary," and was reincorporated by Regents action by the issuance of an absolute charter in the first instance under the corporate name "College of St. Angela" in 1904, amended to change the corporate name to "The College of New Rochelle" in 1910.

CNR was formed for the educational purpose of operating a degree-granting college. CNR is a charitable corporation and does not have any members, and prides itself on serving underprivileged and first-generation college students. Since its establishment, CNR has operated a liberal arts college, renowned for its nursing program, serving the needs of many thousands of students. CNR's main campus consists of approximately 15.5 acres of real estate located in New Rochelle, Westchester County, New York (the "**Campus**"), comprised of three tax parcels: (i)

29/53 Castle Place (2-423-0001) ("**53 Castle**"), (ii) 215 Liberty Avenue (2-452-0001) ("**215 Liberty**"), and (iii) 226 Liberty Avenue (2-456-013) ("**226 Liberty**"). All of the foregoing parcels are owned outright by the Debtor, except for the portion of 53 Castle on which the Student Campus Center, Gill Library and Mooney Center are situated, which were transferred to NRIDA and leased back to the Debtor in connection with securing the NRIDA bonds. CNR believes that this aspect of the bond issue was a disguised security agreement and CNR has valid ownership claims to this portion of the Campus.

A.    <u>Controller Malfeasance</u>

CNR responded to extremely difficult financial challenges upon the discovery of the malfeasance of its former Controller. In August 2016, the Board of Trustees learned for the first time that CNR may have failed to pay federal payroll taxes for the period of mid-2014 through mid-2016. This discovery occurred shortly after the retirement on June 30, 2016 of the Controller, who had been responsible for paying the payroll taxes. At that time, the Board of Trustees formed a Special Committee, who retained professionals, to investigate further into the payroll tax issue. The investigation turned up many serious instances of misconduct on the part of the Controller, including the following:

- Failure to pay payroll taxes for a two-year period

- Misappropriation of government grant money to cover unauthorized expenses

- Unauthorized use of endowment funds

- Failure to make payments to creditors and routinely bouncing and kiting checks

- Active concealment of CNR's true financial situation by refusing to provide information, making misrepresentations, and issuing false financial information

The Controller's misconduct resulted in an indictment against him by the United States Attorney

3

for the Southern District of New York and a civil complaint filed by the Securities and Exchange Commission. In March 2019, the former Controller pled guilty to fraud and failure to pay payroll taxes that ultimately left CNR with over $31 million in previously undisclosed debts. He was scheduled to be sentenced on August 28, 2019.

In response to the discovery of the significant tax obligations, CNR engaged Ronald Eagar, a CPA at Grassi & Co to work out a payment plan with the taxing authorities, establish proper accounting procedures and assist with moving forward with necessary audits for the school to maintain its accreditation. In this regard, CNR successfully entered into payment plans with the Internal Revenue Service ("IRS") and the New York State Department of Taxation and Finance ("NYSDTF"; together with the IRS, the "**Taxing Authorities**"). Pursuant to those agreements, the Taxing Authorities waived all penalties and interest accrued due to the failure to pay eight (8) quarters of withholding taxes. CNR remains engaged with the IRS for the purpose of seeking a waiver of additional interest accruing on the outstanding principal balance currently subject to the payment plan.

At the time of the discovery, CNR had an endowment of approximately Three Million Six Hundred Thousand ($3,600,000) Dollars, of which just over One Million ($1,000,000) Dollars was unrestricted. Because of the limited endowment, CNR was, and remained until it ceased providing educational services, totally dependent on tuition revenues to maintain operations and service its debt.

In an effort to stabilize its financial situation, CNR undertook an exhaustive search to strategically partner or merge with another institution of higher learning. Despite entering into letters of intent with two institutions, both contemplated transactions failed to close. Both potential merger partners cited CNR's debt level as the reason why the transactions did not

progress past the due diligence phase.

B.      Engagement of Chief Restructuring Officer

Despite significant efforts by CNR, the financial challenge which arose out of the

Controller's malfeasance was ultimately insurmountable. As a result, CNR engaged Getzler

Henrich & Associates LLC, management and financial consultants and Herbert A. Weil, as Chief

Restructuring Officer (the "**CRO**") on May 2, 2019, to guide CNR's wind down efforts both

prior to and ultimately, during the Chapter 11 case.  Mr. Weil, myself and other members and

employees of Getzler have been, and will continue to, among other things, work with the Board

of Trustees in developing a wind down plan, oversee the implementation of such a plan,

including the sale of CNR's assets, assist with compliance with CNR's reporting requirements,

and assist in the preparation of all financial documents and schedules needed to be prepared in

connection with the Chapter 11 case.

C.      Teach-Out Agreement

In addition, over the past five months, CNR has worked closely with federal and state

regulators and accreditors to provide for an orderly wind down, with the focus on protecting

CNR's nearly 2,400 current students. CNR determined that it would cease its educational

instruction following the completion of the summer 2019 academic session on August 10, 2019.

It is noteworthy that during this extended period of financial distress, CNR retained all

accreditations and was able to confer degrees on thousands of students. Following its cessation

of academic instruction, the only way that CNR's current students will see their education

completed without enduring significant hardships of having to repeat courses and re-earn credits

received from CNR, is through other institutions of higher education as transfer students.

To that end, CNR and Mercy College ("**Mercy**") executed a Teach-Out Agreement dated

January 18, 2019 (the "**Teach-Out Agreement**") providing for Mercy to make certain educational programs available to students of CNR. The Teach-Out Agreement provides that Mercy is the teach-out partner for those educational programs of CNR which have been determined by both CNR and Mercy to align with Mercy's current offerings and programs for which Mercy has or is able to obtain regulatory approval to extend to students of CNR pursuant to the Teach-Out Agreement (collectively the "**Teach-Out Programs**").

CNR and Mercy also entered into an Agreement of Mutual Cooperation, dated March 14, 2019 (the "**AMC**"), pursuant to which CNR and Mercy laid out terms for their cooperation to ensure that CNR's students transferring to Mercy would have a seamless transition and that Mercy would have access to certain resources of CNR necessary to provide educational programs to such transfer students consistent with the Teach-Out Agreement. Unlike many educational institutions facing the prospect of immediate closure, CNR has had the benefit of entering into the Teach-Out Agreement with Mercy whereby Mercy will provide the Teach-Out Programs which can accommodate the voluntary transfer of CNR's students to Mercy with (i) full recognition of credits earned at CNR, and (ii) for those students who complete their education at Mercy, substantially the same financial arrangements they had with CNR.

In furtherance of the Teach-Out Agreement and consistent with the AMC, CNR negotiated a Lease Agreement dated as of June 28, 2019 (the "**Lease Agreement**"), pursuant to which Mercy would lease substantially all of the Campus. Pursuant to the Lease Agreement, Mercy prepaid One Million Two Hundred Thousand ($1,200,000) Dollars of rent. This prepayment of rent allowed CNR to orderly conclude its summer sessions resulting in the graduation of two hundred and thirty four students that would not have graduated. The Lease Agreement will also allow CNR to preserve its property tax free asset status by ensuring CNR's

educational purpose is accomplished by providing facilities for Mercy to conduct the Teach-Out

Programs under the Teach-Out Agreement and AMC for an interim, transitional period of up to

twenty five (25) months. CNR will continue to work in the Chapter 11 Case with its secured

creditors regarding the ultimate disposition of its assets in order to provide funds necessary to

satisfy creditors as fully as possible.   Prior to the Petition Date, CNR sought and obtained

approval of the Supreme Court, State of New York, County of Westchester, of the Lease

Agreement as required by Sections 510 and 511 of the New York Not-for-Profit Corporation

Law, and presently operates thereunder.

     D.    <u>Secured Debt</u>

CNR has significant secured debt, as detailed in paragraphs 7 through 15 of the DIP

Motion (as defined below), incorporated herein by reference.

During the Chapter 11 Case, and during the term of the Lease Agreement, it is CNR's

intention to market its assets, consisting primarily of the real property, for sale to satisfy as much

of its debt as it can.

     5.    <u>Local Rule 1007-2(a)(2)</u>: Not applicable because the Debtor's case was not

originally commenced under Chapter 7 or 13.

     6.    <u>Local Rule 1007-2(a)(3)</u>: Not applicable because no committee was organized

prior to the Petition Date.

     7.    <u>Local Rule 1007-2(a)(4)</u>: Schedule 1 hereto lists the following information with

respect to each of the holders of the Debtor's twenty (20) largest unsecured claims, excluding

claims of insiders: the creditor's name, address (including the number, street, apartment or suite

number, and zip code, if not included in the post office address), telephone number, the name(s)

of persons(s) familiar with the Debtor's accounts if known, the amount of the claim, and an

indication of whether the claim is contingent, unliquidated, disputed or partially secured.

8.     <u>Local Rule 1007-2(a)(5)</u>: Schedule 2 hereto provides the following information with respect to each of the holders of the Debtor's six (6) largest secured claims: the creditor's name and address (including the number, street, apartment or suit number, and zip code, if not included in the post office address), the amount of the claim, a brief description of the claim, an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

9.     <u>Local Rule 1007-2(a)(6)</u>: Schedule 3 hereto is a summary of the Debtor's assets and liabilities.

10.    <u>Local Rule 1007-2(a)(7)</u>: Not applicable because none of the securities of the Debtor are publicly held.

11.    <u>Local Rule 1007-2(a)(8)</u>: Not applicable because none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

12.    <u>Local Rule 1007-2(a)(9)</u>:  The Debtor operates solely from its New Rochelle Campus, comprised of the three (3) parcels identified above:  53 Castle, 215 Liberty and 226 Liberty.

13.    <u>Local Rule 1007-2(a)(10)</u>: Schedule 4 hereto provides the location of the Debtor's substantial assets, the location of its books and records, and the nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States.

14.    <u>Local Rule 1007-2(a)(11)</u>: Schedule 5 hereto provides a list of current litigations involving the Debtor.

15.    <u>Local Rule 1007-2(a)(12)</u>: Schedule 6 hereto provides a list of the names of the

individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience

16.     <u>Local Rule 1007-2(b)(1)</u>: Schedule 7 hereto provides the estimated amount of weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date.

17.     <u>Local Rule 1007-2(b)(2)</u>:  The Debtor is a non-profit entity and, therefore, has no shareholders.  The Debtor does not propose to pay any officers or members of its Board of Trustees for the thirty (30) day period following the Petition Date. other than myself as Interim CRO, which payment is included in the amounts to be paid to Getzler under its engagement agreement with CNR.

18.     <u>Local Rule 1007-2(b)(3)</u>:  Schedule 8 hereto provides a schedule of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing for the thirty (30) day period following the Petition Date.

## II. SUMMARY OF FIRST DAY MOTIONS[1]

19.     To enable the Debtor to operate effectively and to minimize adverse effects from its chapter 11 filing, the Debtor has requested or will be requesting various relief in "first day" motions (the **"First Day Motions"**) filed with the Court and described below.  In connection with preparing for this case, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with the input and assistance of Mr. Weil and myself.  I believe that the information contained in the First Day Motions is accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions is critical to the Debtor's ability to preserve the value of its estate and succeed in its

reorganization efforts.

A.   *Motion for Entry of an Order Authorizing the Debtor to (I) Continue Its Cash Management System, (II) Maintain Existing Bank Accounts, and (III) Waive Certain Operating Guidelines Relating to Bank Accounts*

20.   Pursuant to this Motion (the "**Cash Management Motion**"), the Debtor seeks entry of an order authorizing the Debtor operate its cash management system in accordance with its prepetition operations and maintain its prepetition bank accounts. In this regard, the Debtor has seven (7) bank accounts[2] into which different types of funds are deposited. The Debtor's cash management system utilizes these various accounts and fraud prevention features, and, in the ordinary course of business, the Debtor transfers money between and among the accounts for its operations. These various accounts are integrated to the Debtor's established mechanism for the collection, management and disbursement of funds used in its operations. If the Debtor's operations are interrupted and payments are halted, the Debtor will be unable to maximize the value of its estate. It is therefore essential to be permitted to continue to use its cash management system to manage its cash flow in accordance with its procedures employed prior to the Petition Date. Accordingly, the relief requested in the Cash Management motion should be approved by the Court.

B.   *Application for Order Extending Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs*

21.   Pursuant to this Motion, the Debtor seeks entry of an order extending the time by which the Debtor must file its schedules and statement of financial affairs in its bankruptcy case. The Debtor seeks an extension of an additional thirty (30) day period to finalize and file its extensive schedules and statements. By virtue of the size of the Debtor's case and the

---

[1] Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.
[2] The Debtor also has three (3) accounts at KeyBank, which only remain open because of levies against those accounts. The Debtor intends to close the KeyBank accounts once the levies are lifted.

myriad of issues leading up to the filing and attendant to the early days of filing, the Debtor was unable to complete its statements and schedules prior to filing and therefore request the additional time that is set forth in this Motion. Accordingly, the Debtor believes that the relief requested in this Motion is warranted and should be granted.

C.    *Motion Pursuant to Rule 9007 of the Federal Rules of Bankruptcy Procedure for Authority to Establish Notice Procedures*

22.    Pursuant to this Motion the Debtor seeks to establish procedures for certain notices required during the pendency of the Debtor's bankruptcy. It is believed that given the size of this case, implementing the notice procedures contained in this Motion will facilitate the efficient administration of the case. Through the Motion, the Debtor proposes to establish a Master Service List containing the entities described in the Motion to which notice will be limited, with certain exemptions including notice of the Section 341 meeting, notice of the bar date for filing claims in the Debtor's case, the sale of all or substantially all of the Debtor's assets, the time fixed for filing objections to, and the hearing to consider approval of, a disclosure statement and a confirmation of a plan of reorganization, and notice of transmittal of ballots accepting and rejecting the plan of reorganization.

D.    *Application for Order Authorizing Payment of Prepetition Salaries, Wages and Employee Benefits and Granting Related Relief*

23.    The Debtor seeking order of an entry authorizing it to pay prepetition wages, salaries and other compensation, and to continue payment of compensation and wages of benefits post-petition in accordance with existing company policy (the "**Wage Motion**").

24.    As of the Petition Date, the Debtor employs approximately thirty two (32) employees, all of whom are paid bi-weekly. The total payroll for the Debtor's employees per pay period amounts to approximately $94,456. The last payment date for the wages to such

11

employees was September 13, 2019. The employees will next be paid on September 27, 2019 for the two (2) week period of September 7 through September 20, 2019, all of which is pre-petition. In addition, some of the Employees are entitled to accrued vacation pay, which the Debtor also proposes to pay up to the section 507(a) cap. No payments made to any Employee for the combined wages and vacation accrual will exceed the $13,650 limit of sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

25.   To the minimize the personal hardship that the employees would suffer is their wages are not paid when due, the Debtor seeks authority under the Wage Motion to pay the prepetition compensation to its employees including accrued vacation, sick days and holiday pay in the ordinary course of business. Additionally, the Debtor deducts certain amounts from its employees' paychecks for the payments of taxes, insurance, retirement plans and garnishments. These amounts are not property of the Debtor's estate, but rather property of the employees which are forwarded to appropriate third parties. Funds may have been deducted from employees' wages prepetition but not yet forwarded to the recipients. Accordingly, the Debtor also seeks authority to forward these deductions to the appropriate parties subsequent to the Petition Date.

26.   The employees provide the Debtor with services necessary to conduct its business and absent these payments, the Debtor will experience an instability in its work force during a critical time in this case. Accordingly, the Debtor believes that the relief requested in the Wage Motion is necessary and appropriate and should be approved by the Court.

E.   *Application for Order Under 28 U.S.C. §156(c) and Rule 5075-1 of the Local Bankruptcy Rules Appointing Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtor*

27.   The Debtor is also requesting the approval of Kurtzman Carson Consultants LLC

("**KCC**") as the Debtor's claims agent in this case. The Debtor anticipates that there will be many hundreds of entities to be noticed and that an appointment of a claims agent is required under Local Rule 5075-1(b). By retaining KCC, the Debtor's estate and the creditors will benefit from the efficient and cost effective methods for notifications in this case. KCC is fully equipped to handle the volume of mailing involved in this case and will follow the notice and claim procedures that conform to the guidelines promulgated by the Clerk's Office. The Debtor believes that KCC is disinterested and that the compensation to KCC is reasonable and appropriate for services of the nature proposed in the application. Since the appointment of a notice and claims agent is not only required but will relieve the Debtor of the burdens associated with claims and noticing services, the Debtor believes that this Motion should also be granted by the Court.

F.     *Motion of Debtor Pursuant to 11 U.S.C. §§105(a) and 363(b) to (I) retain Getzler, Henrich & Associates, LLC to provide the Debtor with Chief Restructuring Officer and (II) Designate Herbert Weil as Chief Restructuring Officer and Mark Podgainy as Interim Chief Restructuring Officer for the Debtor Nunc Pro Tunc to the Petition Date*

28.     The Debtor also seeks to retain Getzler Henrich & Associates, LLC ("**Getzler**") to provide the Debtor with a Chief Restructuring Officer ("**CRO**"), to designate Herbert Weil as the CRO, and Mark Podgainy as Interim CRO. Herbert Weil has acted as on-site CRO for the Debtor since May 2, 2019 and has worked closely with the management and other professionals in assisting with the requirements of the business and exploring restructuring options and ultimately preparing for the filing the chapter 11 case, including negotiating the Debtor's debtor-in-possession financing. Mr. Podgainy stepped in as Interim CRO due to Mr. Weil's medical leave on September 3, 2019, and will act as such until Mr. Weil resumes as CRO. Mr. Weil, Mr. Podgainy and the Getzler Firm have developed significant relevant experience and expertise regarding the Debtor and the unique circumstances of the Debtor's case.

29.     Since Mr. Podgainy is presently operating the Debtor as Interim CRO, it is of utmost importance that his retention and the retention of the Getzler firm be approved on an expedited basis so that there is no disruption in the operations of the Debtor in the chapter 11 case.

G.     *Debtor's Motion for Entry of Interim and Final Orders Authorizing the Debtor to Pay Certain Prepetition Claims of Critical Vendors in the Ordinary Course of Business on a Postpetition Basis*

30.     Pursuant to this Motion (the "**Critical Vender Motion**"), the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay Critical Vendor Claims in an amount not to exceed $150,000.  The Debtor has identified a vendor that supplies services that are vital to the Debtor's operations, specifically, Marist College, which operates the Debtor's Banner computer system as its "host" and provides vital computer operating support for the Debtor.

31.     The Debtor does not believe that it can obtain the critical vendor services from another vendor given the nature of the services and, even where alternatives may exist, the costs associated with switching from one vendor to another would likely be significantly detrimental to the Debtor's estate.  The Debtor believes that jeopardizing its relationship with the Critical Vendors would impose a severe strain on the Debtor's operations and would likely result in significant revenue loss.  On the contrary, amounts to be paid to such Critical Vendors are inconsequential to this case and payment of this relatively ministerial amount would prevent disruption of the Debtor's operations and provide benefit to the estate exponentially greater amount of Critical Vendor Claims.  As a result, the Debtor believes that the relief sought in the Critical Vendor Motion should be granted by the Court on an interim and final basis.

H.     *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Obtain Post-Petition Financing, (B) Authorizing the Use of Cash Collateral, (C) Granting Adequate Protection, (D) Scheduling a Final Hearing and (E) Granting Related Relief (the "**DIP Motion**")*

32.     Prior to the filing of the Debtor's chapter 11 case, the Debtor negotiated the terms of senior secured Debtor-in-Possession financing (the "**DIP Loan**") with Summit National Investments VII LLC (the "**DIP Lender**").    Those arm's length negotiations culminated in the DIP Loan Agreement.  The DIP Loan Agreement provides a commitment of up to $4,000,000 and will be documented as provided for in the DIP Loan Agreement.  The DIP Loan Agreement will permit the Debtor to obtain funding in accordance with an approved budget (the "**Budget**"), attached to the Interim Order as Exhibit 2 thereto.

33.     The Interim Order also provides for the Debtor's use of Cash Collateral, consisting of rent and tuition receivables secured by the Debtor's Pre-Petition Lenders.  The Interim Order provides for adequate protection to both the DIP Lender and the Pre-Petition Lenders.

34.     I believe that the Debtor and its estate will suffer immediate and irreparable harm if the Interim Order is not entered since the Debtor will have no ability to use any monies to operate in chapter 11.  Without such funds, the Debtor would be forced to liquidate its assets at "fire sales", to the detriment of all creditors.

35.     The DIP Loan Agreement is the result of the Debtor's reasonable and informed determination that the DIP Lender offered favorable terms on which to obtain needed post-petition funding, and of the extended arm's length good-faith negotiation between the Debtor and the DIP Lender.  The terms and conditions of the DIP Loan Agreement are favorable and reasonable and the proceeds under the DIP Loan will only be used for purposes that are permissible under the Bankruptcy Code and the Budget.

36.     Moreover, the adequate protection being provided to both the DIP Lender and the Pre-Petition Lenders satisfy the requirements of the Bankruptcy Code.  The Debtor has an immediate need for access to liquidity in order to achieve its objectives in the chapter 11 case and to pay employees, vendors and essential other third-parties during that process.  Based on the circumstances, Debtor requires interim funding under the DIP Loan as well as interim use of Cash Collateral to avoid immediate irreparable harm to the Debtor's estate.

THE COLLEGE OF NEW ROCHELLE


By: s/Mark Podgainy
               Mark D. Podgainy
               Interim Chief Restructuring Officer

Sworn to on the
18th day of September, 2019

s/   Kemar Forbes
Notary Public
Reg. No. 01FO6334750
Commission Expires Dec. 31, 2019

## Schedule 1

**20 Largest Unsecured Claims (Excluding Insiders)**

**See Attached**

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **The College of New Rochelle** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|
| | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 332 E LLC 5676 Riverdale Ave. Suite 307 Bronx, NY 10471 | | Landlord | | | | $152,818.98 |
| 755 Co-op City Associates LP Triangle Equities Mgmt Co LLC 30-56 Whitestone Expressway Whitestone, NY 11354 | | Landlord | | | | $458,686.72 |
| Admissions US, LLC Campus Management Corp. Attn: Billing Boca Raton, FL 33487 | | Vendor | | | | $68,430.06 |
| ATI 11161 Overbrook Rd. Plainview, NY 11803 | | Vendor | | | | $202,350.00 |
| Bedford Stuyvesant Restoration Corporation 2368 Fulton Street Brooklyn, NY 11216 | | Landlord | | | | $126,641.78 |
| Con Edison PO Box 1701 New York, NY 10116-1701 | | Utility | | | | $32,167.84 |
| Culinart 175 Sunnyside Blvd. Plainview, NY 11803 | | Vendor | | | | $141,126.02 |
| EAB Royall and Company 1920 E Parham Rd. Henrico, VA 23228 | | Vendor | | | | $56,075.00 |

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

Debtor   __The College of New Rochelle_____      Case number *(if known)*   _____
         Name

| Name of creditor and complete mailing address, Including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| FHEG Coll-New Roch. Camp Store Store No 518 3146 Solutions Center Chicago, IL 60677 | | Vendor | | | | $86,287.74 |
| Industry and Local 338 Pension and Welfare 911 Ridgebrook Rd Sparks Glencoe, MD 21152-9451 | | Pension | | | | $3,972,524.85 |
| Janney Montgomery Scott LLC 1717 Arch Street 22nd Floor Philadelphia, PA 19103 | | Professionals | | | | $50,000.00 |
| Kaufman Borgeast & Ryan LLP 120 Broadway New York, NY 10271 | | Professionals | | | | $23,082.07 |
| Marist College Information Technology 3399 North Rd Poughkeepsie, NY 12601 | | Vendor | | | | $273,921.25 |
| Paetec Communications Inc PO Box 9001013 Louisville, KY 40290-1013 | | Vendor | | | | $54,417.98 |
| REEC West 125th St LLC c/o Real Estate Equities Corp 18 East 48th St Penthouse New York, NY 10017 | | Landlord | | | | $243,945.00 |
| Registry for College & University Presidents 3 Centennial Dr, Ste 320 Peabody, MA 01960 | | Vendor | | | | $57,600.00 |
| Strata Information Group 3935 Harney Street Ste. 203 San Diego, CA 92110 | | Vendor | | | | $35,657.50 |

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                       Best Case Bankruptcy

Debtor   **The College of New Rochelle**                                    Case number *(if known)* _____
         Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| **Tax Collector - New Rochelle City Hall Tax Office 515 North Avenue New Rochelle, NY 10801** | | **Taxes** | | | | $105,011.07 |
| **Transworld Systems Inc PO Box 5505 Attn Norcross Lockbox 24886 Carol Stream, IL 60197-5505** | | **Vendor** | | | | $26,562.63 |
| **Westchester Academic Library Directors Org 118 N Bedford Road Suite 201 Mount Kisco, NY 10549** | | **Vendor** | | | | $26,971.83 |

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com        Best Case Bankruptcy

## Schedule 2

### 6 Largest Secured Claims

| Creditor | Amount of Claim | Description of Claim | Value of Collateral Securing Claim | Lien or Claim Disputed (Y/N) |
|---|---|---|---|---|
| United States Treasury Internal Revenue Service P.O. Box 480, Stop 660 Holtsville, NY 11742-0480 | $15,944,475.86 | Tax Debt | | Y |
| Commissioner of Taxation and Finance 44 South Broadway, 6th Floor White Plains, NY 10601-4425 | $2,403,429.11 | Tax Debt | | N |
| Citizens Bank /DASNY 515 Broadway Accounts Receivable Albany, NY 12207 | $31,985,330.66 | Loan | | N |
| Carney Family Charitable Foundation C/O Claremont Companies Lakeshore Center Bridgewater, MA 02324 | $2,043,375.77 | Loan | | N |
| Key Bank PO Box 94831 Cleveland, OH 44101 | $2,459,603.33 | Loan | | N |
| NRIDA 515 North Ave Dept. of Development New Rochelle, NY 10801 | $13,010,000.00 | Bond Debt | | N |

**<u>Schedule 3</u>**

**Summary of Debtor's Assets and Liabilities**

See Attached

# PRELIMINARY
# BALANCE SHEET

|  | 8/28/2019 |
|---|---|
| Cash and Cash Equivalents | $ 1,993,057.35 |
| Cash and Cash Equivalents - RESTRICTED | 923,138.00 |
| Gov't Accts Receivable | 531,535.50 |
| Student Receivables (Net of $5,018,891.73 allowance) | 2,337,201.21 |
| Contribution and Other Receivable | 500,000.60 |
| Other Assets | 1,989,728.39 |
| Investments - Restricted Endowment | 3,059,744.09 |
| Investments - Restricted Segregated Annuity Account | 619,472.00 |
| Long Term Loans - Perkins and Nursing | 3,837,717.00 |
| Deposits with Bond Interest | 3,175.52 |
| Beneficial Interest | 354,881.63 |
| Land Building and Equipment | 55,888,064.15 |
| **Total Assets** | **$ 72,037,715.44** |
| | |
| Accounts Payable and Accrued Exp | $ 9,458,779.61 |
| Payroll Tax Liab | 18,347,913.28 |
| Notes Payable | 2,312,088.47 |
| Line of Credit | 2,000,000.00 |
| Deferred Rental Revenue | 1,200,000.00 |
| Long Term Debt | 43,816,191.00 |
| Accrued Post Retirement Benefit | 557,279.00 |
| US Govt Grants Refundable - perkins and Nursing | 4,443,662.36 |
| **Total Liabilities** | **82,135,913.72** |
| **Total Net Assets** | **(10,098,198.28)** |
| **Total Liab & Net Deficit** | **$ 72,037,715.44** |

## Schedule 4

**Location of Debtor's Significant Assets, Books
and Records and Assets Outside of U.S.**

| Asset | Location | Value (if Outside U.S.) |
|---|---|---|
| Books and Records | New Rochelle Campus | N/A |
| Real Property | New Rochelle Campus | N/A |

## Schedule 5

### Pending Litigation and Claims

1.      Article 78 Litigation by Faculty Members (Supreme Court, New York County Index No. 159267/2017) An Article 78 proceeding was filed in October 2017 by fourteen (14) faculty members who were dismissed by the Debtor in June 2017 seeking reinstatement, and by the Faculty Council and College Senate seeking a declaratory judgment as to the rights of faculty under the Debtor Handbooks regarding layoffs.  The Debtor's insurance carrier assigned Kaufman, Borgeest & Ryan, LLP, located at 120 Broadway, 14th Floor, New York, NY 10271, to defend the Debtor.

2.      Joe Williams v. College of New Rochelle et al. (NYS Supreme Court, Bronx County, Index No.: 25366/2015E): This lawsuit was filed in September 2015 against the College, among others, alleging wrongful termination and discrimination in violation of New York City Administrative Code 8-502 and 8-107(11) by a former employee of the Debtor, who was terminated for cause in October 2014 after an investigation into his alleged misconduct.  The Debtor's insurance carrier assigned Kaufman, Borgeest & Ryan, LLP, located at 120 Broadway, 14th Floor, New York, NY 10271, to defend the Debtor.

3.      Madison Carmichael v. The College of New Rochelle (Supreme Court, Westchester County, Index No.: 63457/18):  This is a personal injury lawsuit that was filed against the Debtor in August 2018.  An answer was filed on behalf of the Debtor in October 2018.  Harrington, Ocko & Monk is representing the Debtor in this case.

4.      Yvonne Taylor v. The College of New Rochelle (Supreme Court, Kings County, Index No.: 502414/19):  This is a sexual harassment lawsuit that that was filed against the Debtor and individual defendants in February 2019.  The Debtor's insurance carrier assigned Kaufman, Borgeest & Ryan, LLP, located at 120 Broadway, 14th Floor, New York, NY 10271, to defend the Debtor.

### Schedule 6

**Senior Management**

| Name | Title | Tenure | Experience/Responsibilities |
|---|---|---|---|
| Herbert A. Weil | Chief Restructuring Officer | May 2, 2019 to date | Oversight of all day-to-day operations and general management and advisory services |
| Mark D. Podgainy | Interim Chief Restructuring Officer | September 3, 2019 to date | Oversight of all day-to-day operations and general management and advisory services during Mr. Weil's medical leave |
| Michael O'Donnell | Controller | March 31, 2017 to date | Supervision of financial reporting |

## Schedule 7

### Estimated Weekly Payroll

Pursuant to Local Rule 1007-2(b)(1), the estimated amount of gross weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date is approximately $52,000 per week.

## Schedule 8

### Cash Receipts and Disbursements, Net Cash
### Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| | |
|---|---|
| **Cash Receipts** | $92,000.00 |
| **Cash Disbursements** | $1,206,687.17 |
| **Net Cash Gain (Loss)** | $(1,114,687.17) |
| **Unpaid Obligations (excluding professional fees)** | $101,053.57 |
| **Unpaid Receivables (excluding professional fees)** | $0 |